Filed 6/10/24

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097971 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE017331) |
| v. | |
| CRYSTAL GRAHAM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Raoul M. Thorbourne, Judge. Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ivan P. Marrs and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

This appeal arises from the trial court's denial of defendant Crystal Graham's postconviction request for pretrial mental health diversion under Penal Code section 1001.36.[1] Defendant first contends that, in ruling on her request, the trial court was limited to viewing the matter as it stood *before* trial, and hence the trial court prejudicially erred in considering the transcripts of her trial and resulting convictions when assessing her eligibility and suitability for diversion. Defendant also argues that, even if the trial court did not err by taking the trial evidence and her convictions into account, it still erred by finding her both ineligible and unsuitable for diversion. We will affirm.

FACTUAL AND PROCEDURAL HISTORY

On March 22, 2018, a jury found defendant guilty of kidnapping to commit robbery (§ 209, subd. (b)(1)), kidnapping during the commission of carjacking (§ 209.5, subd. (a)), second degree robbery (§ 211), and simple kidnapping (§ 207, subd. (a)). In a prior opinion, we summarized defendant's underlying crimes as follows:

On August 28, 2016, "[d]efendant [ ] brought the victim, E.C., to a motel room where he was attacked by her codefendant Joe Navarro, who held a box cutter to the victim's neck and relieved him of his wallet and keys. Defendant took the victim's bank card, went to an ATM, called Navarro who forced the victim to disclose his personal identification number (PIN), and withdrew $400. Defendant and Navarro left the motel in two vehicles, a Toyota 4Runner, in which they had arrived, and the victim's Prius, with the victim first in the backseat of the 4Runner and then transferred to the Prius driven by defendant. The victim escaped by untying the tape binding his hands, jumping out of the Prius when it slowed down on the freeway, and waving to passersby. Defendant exited

---

[1] Undesignated section references are to the Penal Code.

the freeway, abandoned the Prius, and fled in the 4Runner with Navarro." (*People v. Graham* (July 9, 2021, C087027) [nonpub. opn.] (*Graham I*).)[2]

The trial court sentenced defendant to two consecutive terms of life in prison with the possibility of parole (for kidnapping to commit a robbery and kidnapping during the commission of carjacking) and stayed the sentences for the remaining two counts per section 654.

In our opinion on defendant's prior appeal from the judgment, we reversed defendant's conviction for simple kidnapping. (*Graham I*, *supra*, C087027.) Additionally, we acknowledged that the amendments to section 1001.36, which became effective while defendant's prior appeal was pending, applied retroactively to her case. (*Graham I, supra*, C087027.) As a result, we conditionally reversed the remainder of the judgment and remanded the case for a mental health diversion eligibility hearing pursuant to section 1001.36. (*Graham I, supra*, C087027.)

On remand, defendant's mental health diversion application included a report from clinical and forensic psychologist Dr. Bruce W. Ebert, a mental health diversion court referral form, and additional mental health documentation. It also included several letters in support from defendant's daughter and defendant's correctional counselor, certificates and awards defendant received while in prison, and a letter of acceptance from a transitional housing facility. The trial court denied defendant's motion to "exclude all trial transcripts from consideration."

At defendant's section 1001.36 mental health diversion hearing, defendant's counsel made an offer of proof as to treatment and housing that defendant would receive

---

[2]     The People's motion to incorporate by reference the record from *Graham I*, is granted in part. We grant the motion as to our previous opinion in *Graham I*, as well as the trial transcript and preliminary hearing transcript. We deny the motion as to the remainder of the record on relevance grounds.

if diverted. Counsel further stated that, if called to testify, defendant would acknowledge that she understands her rights and agrees to comply with the program.

The trial court remarked that the portion of Dr. Ebert's report regarding a causal connection between defendant's mental illness and criminal behavior consisted of "rather short and rather cryptic" comments. Accordingly, it permitted Dr. Ebert to testify as to the contents of his report. At the hearing, Dr. Ebert opined there was "no question in [his] mind" that there was a causal connection between defendant's mental diagnoses and criminal behavior. He testified that defendant's mental disorders and history of substance abuse led to defects in her brain that impaired her ability to fully understand the consequences of her actions. He further opined that defendant had been "led by Navarro," had been "under duress" by him at the time of the underlying offense s, and may have been afraid Navarro would harm her children if she did not comply, particularly because she had been abused by men previously. In sum, he found that defendant's mental health disorder and the effects of methamphetamine on her brain rendered her unable to make good choices, which was the "nexus" between the diagnoses and crimes. Dr. Ebert said that, when preparing his report, he reviewed various behavioral health and prison records relating to defendant, as well as this court's opinion in *Graham I*, and would have liked to review the transcripts of defendant's trial, but could not obtain copies and therefore did not read the transcripts, including those reflecting defendant's extensive trial testimony.

The prosecutor cross-examined Dr. Ebert and later argued that Dr. Ebert never opined as to how defendant's diagnosed disorder was connected to the crime, and that his report was internally inconsistent. She went on to recount the details of the crimes based on evidence presented at trial and urged the trial court to focus on defendant's conduct before and during the crime, which indicated that she willingly worked in tandem with Navarro to rob and kidnap the victim. The prosecutor noted that the jury's findings

4

reflect that the jurors disregarded defendant's claim of duress and did not find defendant credible.

The prosecutor further argued that defendant posed an unreasonable risk of danger to public safety because she had been convicted of two super strikes under the Penal Code in this case, and she had a history of prior noncompliance with court-ordered treatment, including mental health treatment. She also argued that defendant was seeing a mental health provider and getting drug treatment and services at the time she committed the underlying offenses. The prosecutor noted that the proposed treatment site for defendant was not a locked facility, so it could not ensure that defendant would stay drug-free or sober.

In closing, defense counsel read defendant's statement saying that she takes full responsibility for her involvement in the crimes against the victim and today has new values and beliefs.

The trial court first found that defendant was ineligible for mental health diversion. It viewed Dr. Ebert's description of the nexus between the diagnosis and criminal behavior as "rather scant" and "not detailed." The court observed, "I have no evidence that I found from any other source, at the time, that the Defendant's admittedly diagnosed [disorder] played any role in her commission of these crimes." Further, she was not under the influence of drugs or suffering from delusions or hallucinations at the time of the underlying crimes. The court found there was no evidence that physiological brain changes from drug abuse influenced her behavior. The court also found relevant that defendant was "the principal actor" in crimes that "took a certain amount of sophistication, elaboration, and planning," and that defendant "helped to formulate the plan" and carry it out, which took place over an extended period of time. Accordingly, the court found clear and convincing evidence to overcome the presumption there was a connection between defendant's diagnosis and criminal behavior "given the facts as laid out by [the prosecutor] and as laid out, . . . in the trial transcript . . .detailing, step by step,

5

her participation in this case." It concluded there was "no nexus" between her mental health diagnosis and criminal behavior.

The trial court next found, with regard to suitability, that defendant posed an unreasonable risk of danger to public safety. It reasoned that, while typically mental health diversion applications are considered pretrial such that the court has to assess ahead of time whether someone *might* commit a super strike if released into the community, here, defendant's convictions make it knowable that she *did*, in fact, commit two super strikes. Taking the interests of the community into account, the court found that defendant's participation in the crimes, along with her convictions and life sentences, disqualified defendant from diversion.

The trial court vacated defendant's conviction for simple kidnapping per *Graham I* and affirmed the rest of the judgment, reinstating defendant's sentence on the remaining offenses.

## DISCUSSION

Defendant contends that she was entitled to the full retroactive benefit of a pretrial diversion hearing, such that the trial court prejudicially erred by admitting her trial transcripts and considering her convictions when assessing her eligibility and suitability at a hearing intended by the Legislature to occur before trial. In the alternative, defendant contends that the trial court abused its discretion by finding that she was neither eligible nor suitable for diversion.

### I

*Section 1001.36*

In June 2018, the Legislature enacted sections 1001.35 and 1001.36, which authorized pretrial diversion for defendants with qualifying mental health disorders. (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*).) The purpose of the statute is: (1) to increase "diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public

6

safety"; (2) to allow local discretion and flexibility for counties to develop and implement diversion for individuals with mental disorders across a continuum of care settings; and (3) to provide "diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35, subds. (a)-(c).)

While defendant's appeal was pending, Senate Bill No. 1223 (2021-2022 Reg. Sess.), effective January 1, 2023, amended section 1001.36 to give courts discretion to grant pretrial diversion "if the defendant satisfies the eligibility requirements for pretrial diversion set forth in subdivision (b)" and the court finds "that the defendant is suitable for that diversion under the factors set forth in subdivision (c)." (§ 1001.36, subd. (a), as amended by Stats. 2022, ch. 735, § 1.) Senate Bill No. 1223's amendments to section 1001.36 applied retroactively to defendant's case on remand. (*Graham I*, *supra*, C087027, citing *Frahs, supra*, 9 Cal.5th at p. 640.)

As presently enacted, section 1001.36, subdivision (b) provides that a defendant is eligible for pretrial diversion if two criteria are met. First, the defendant has been diagnosed with a mental disorder, such as the one with which defendant was diagnosed, within the last five years by a qualified mental health expert. (§ 1001.36, subd. (b)(1).) Second, the "defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(2).) "If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (*Ibid.*)

If a defendant meets these eligibility requirements, the court also must find that the defendant is suitable for pretrial diversion based on satisfaction of the following criteria: "(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. [¶] (2) The defendant consents to diversion and

7

waives the defendant's right to a speedy trial . . . . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion . . . . [¶] [and] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)-(4).)

We review a trial court's ruling on a petition for pretrial mental health diversion for abuse of discretion. (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147; *People v. Moine* (2021) 62 Cal.App.5th 440, 448-449; see *Frahs, supra*, 9 Cal.5th at p. 626.) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence [citation]." (*Moine, supra*, at p. 449.)

II

*Trial Transcripts and Defendant's Convictions*

We first consider defendant's argument that the trial court prejudicially erred by considering her trial transcripts as evidence when denying her request for mental health diversion. We find no error in the trial court's ruling.

Before the diversion hearing, defendant moved "to exclude all trial transcripts from consideration." Defendant argued that the trial court may not consider the trial transcripts because it must revert the case to its pretrial posture to properly assess her for pretrial diversion under section 1001.36. The trial court denied the motion, reasoning that it was entitled to consider the evidence adduced in the transcripts, which was crucial to assessing defendant's dangerousness. It further noted that it was familiar with defendant's history, having presided over her trial.

As amended, section 1001.36 permits the trial court to consider any and all relevant evidence. (§ 1001.36, subd. (b)(2) ["A court may consider any relevant and credible evidence"].) It does not carve out an exception for evidence presented at trial, which makes sense given that the statute typically applies *before* a trial. Because of the

8

posture of this case, however, the trial court had access to extensive trial transcripts and reasonably found the trial evidence relevant to its assessment of defendant's dangerousness.[3]  Notably, section 1001.36 expressly permits the trial court to consider preliminary hearing transcripts and witness statements.  Thus, even in a pretrial context, there is nothing preventing the court from hearing evidence of what the People anticipate presenting at trial.  Hence, consistent with the plain language of the statute, we conclude that section 1001.36, subdivision (b)(2) authorizes the trial court to consider any relevant and credible evidence regardless of the format or timing of its presentation.  (See *People v. Oneal* (2021) 64 Cal.App.5th 581, 591 [admissibility of evidence at § 1001.36 hearing turns on the relevance of the proffered evidence].)

Despite the broad discretion granted by the text of the statute, defendant contends that *Frahs, supra*, 9 Cal.5th 618 and *People v. Qualkinbush* (2022) 79 Cal.App.5th 879 (*Qualkinbush*) suggest that a court may not consider a defendant's trial transcripts on remand for a "pretrial" hearing.  We find these cases distinguishable, as neither addresses the evidentiary question before us.  In *Frahs*, our Supreme Court held that section 1001.36 applies retroactively to nonfinal judgments.  (*Frahs, supra*, at p. 640.)  It then opined that the proper remedy for retroactive application of the statute is a conditional, limited remand to conduct a mental health diversion eligibility hearing.  (*Ibid*.)  In reaching this conclusion, it stated the broad proposition that, on remand for retroactive application of section 1001.36, a case is restored to its "procedural posture before the jury verdict for purposes of evaluating defendant's eligibility for pretrial mental health diversion."  (*Frahs*, at p. 639.)  Thus, *Frahs* addresses only a defendant's entitlement to a retroactive diversion hearing, and the general, conditional posture of such cases on remand.  The Supreme Court did not consider the admissibility of evidence on remand.

---

[3]     Defendant does not challenge the relevance or credibility of the trial transcripts, objecting solely based on the pretrial posture of the case on remand.

*Qualkinbush* is similarly inapplicable. In *Qualkinbush*, the court recognized that applying the goals of sentencing to a mental health diversion application is improper and remanded the matter to the trial court to reconsider diversion. (*Qualkinbush, supra*, 79 Cal.App.5th at pp. 891-892.) In a footnote, it commented that "[f]or purposes of evaluating the defendant's eligibility and/or suitability for pretrial mental health diversion, the court must treat the matter as if the charges against the defendant have not yet been adjudicated . . . " (*Id.* at p. 892, fn. 11.) Again, this is a statement about the conditional posture of the case on remand; neither the *Frahs* nor *Qualkinbush* court suggested that a trial court must ignore relevant evidence simply because it was introduced at trial.[4]

In addressing defendant's arguments regarding the admissibility of the trial transcripts, we are compelled to note the paradox inherent in her position. While arguing that this case must be returned to its pretrial status, effectively erasing any evidence of what occurred or was presented thereafter, defendant simultaneously urges us to consider evidence of her progress and behavior while in prison (which defendant introduced and urged the trial court to consider at her diversion hearing). However, if we were to conclude that the case must be returned to its pretrial posture, and that any trial and posttrial evidence must be excluded from the diversion analysis, it stands to reason that evidence of defendant's *post-conviction* actions or behavior also would be subject to exclusion. But, like trial evidence, evidence relating to a defendant's behavior in prison may be relevant and useful to a court's diversion assessment, and excluding such evidence could unduly limit the court's analysis. Thus, the rule that defendant proposes

---

[4]     We also note that, although defendant here does not necessarily benefit from the introduction and consideration of trial evidence at her mental health diversion hearing, the conclusion we reach may benefit defendants in other cases, given that favorable evidence also could be introduced and considered.

10

brings into focus the difficulty inherent in drawing lines of admissibility if we prohibit relevant evidence simply because of the posture of the case on remand.

Based on the foregoing, we find no error or abuse of discretion in the trial court's consideration of facts from the trial transcripts.[5]

We further find that defendant forfeited her argument that the trial court could not consider her convictions in its analysis.[6] "It is axiomatic that arguments not raised in the trial court are forfeited on appeal." (*Kern County Dept. of Child Support Services v. Camacho* (2012) 209 Cal.App.4th 1028, 1038.) Here, defendant's attorney did not expressly object to the trial court's consideration of defendant's convictions at the hearing. Rather, he made a motion "to exclude all trial transcripts from consideration by the Court" because the case "should have been, under the law, looked at prior to her conviction." The court denied the motion and specifically found the *transcripts* admissible, making no mention of defendant's *convictions*. Later, the court and prosecutor discussed defendant's convictions at length, with regard to the suitability analysis, and defendant's attorney did not object. Later still, defendant's attorney said: "She is not in any way asserting that she is not guilty of those crimes. She absolutely takes responsibility for those terrible crimes that she did in 2016. She's not

---

[5] Although the trial court said it would consider the trial transcripts for purposes of deciding whether defendant posed a danger to public safety, it also relied on the transcripts, and the prosecutor's reassertion of the facts presented at trial, to determine that there was no nexus between defendant's mental disorder and the offenses.

[6] The parties did not address forfeiture in connection with the propriety of considering defendant's convictions at the diversion hearing. However, the parties had the *opportunity* to brief forfeiture, a rule always implicated when an argument is raised for the first time on appeal. (See *People v. Alice* (2007) 41 Cal.4th 668, 679 ["The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised *or fairly included within the issues raised* does not implicate the protections of [Government Code] section 68081" (italics added)].)

11

denying that." Defense counsel also contested the meaning of the jury's finding on the duress instruction with regard to defendant's convictions, tacitly conceding their admissibility. Finally, Dr. Ebert—defendant's mental health expert—referenced the crimes for which defendant "was convicted" in his testimony, and again, defense counsel did not object.

Based on this record, we conclude that defendant forfeited her argument that the trial court was barred from considering her convictions on appeal.

III

*Suitability*

Defendant next contends that the trial court erred by finding her unsuitable for diversion. We again disagree, as substantial evidence supports the trial court's finding that defendant would pose an unreasonable risk to public safety if granted diversion and treated in the community.

Whether a defendant would pose an "unreasonable risk of danger to public safety" is analyzed employing the definition of that term found in section 1170.18. (§ 1001.36, subd. (c)(4).) Under section 1170.18, an " 'unreasonable risk of danger to public safety' " is "an unreasonable risk that the petitioner will commit a new violent [super strike]." (§ 1170.18, subd. (c).) Thus, a defendant is not suitable for diversion if the defendant is "too dangerous to be treated in the community because he [or she] would commit a new violent super strike." (*People v. Whitmill, supra*, 86 Cal.App.5th at p. 1150.) When determining whether the defendant will pose an unreasonable risk of danger to public safety, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

Here, when assessing defendant's suitability for diversion, the trial court observed that diversion applications are typically brought pretrial, such that the court and all

"interested professionals" are "trying to predict ahead of time whether or not somebody poses a risk that they will commit a [super strike]." However, because defendant had already been convicted of two super strikes, the court stated that nobody "[had] to speculate," as "there is no doubt" she committed two such crimes. Thus, when considering defendant's dangerousness and the interests of the community, the trial court found that defendant's "participation in this case," "what the two crimes were," and the fact that she "has been convicted of two crimes that carry . . . life in prison sentences, . . . [¶] disqualify her" and "the dangerousness standard is met."

It therefore appears that the trial court based its determination on the serious and violent nature of defendant's charged crimes and defendant's actions during the commission of those crimes. Section 1001.36 grants broad discretion to the court to consider any factors it deems appropriate when assessing dangerousness, and it expressly includes "the defendant's violence and criminal history" and "the current charged offense" among the permissible factors. (§ 1001.36, subd. (c)(4).) "[T]here is nothing in section 1001.36, with respect to. . . suitability, that precludes a trial court from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion." (*People v. Bunas* (2022) 79 Cal.App.5th 840, 862.) Thus, the court acted within its discretion in determining that the nature and manner of defendant's charged crimes—and particularly, the two super strikes—rendered her likely to commit another super strike.

Specifically, the evidence presented at trial revealed the following: On August 27, 2016, the day before the charged offenses, defendant and Navarro rented a motel room. Video surveillance from the motel showed them laughing and smiling while talking to the motel clerk upon entry. The following day, defendant walked in front of the victim's car while he was parked at a gas station. Defendant smiled at him, opened the passenger car door, and got into the car. He told defendant to get out, but she put her hand on his crotch and his hand on her breast and said she needed a ride back to the motel. He decided to

drive her to the motel so she would leave his car. At the motel, she pressed him to come into her room for a drink after he hesitated. When he acquiesced and entered the room, Navarro, wearing a Halloween mask, grabbed him and pushed him face down on the bed while holding a box cutter with an exposed blade. Someone took the victim's wallet and keys from his pants, and defendant and Navarro asked for his PIN. Defendant left while Navarro pressed the box cutter to the victim's neck, demanding his PIN. Navarro repeated the PIN over the phone and $400 was withdrawn from the victim's bank account. Defendant returned to the motel room and hit the victim with her hat. Defendant acted angry and the victim was afraid of her.

Navarro taped the victim's wrists together and put him in Navarro's Toyota 4Runner. At that time, the victim heard defendant say they would take him " 'to the woods.' " Defendant got into the victim's Prius and drove away. Both defendant and Navarro drove on the freeway and exited at a vacant lot. Navarro shoved the victim into the Prius and drove to a gas station in the 4Runner. Defendant drove the Prius, with the victim inside, in circles around the gas station parking lot. Then both defendant and Navarro got back on the freeway, with defendant driving in front of Navarro.

The victim started biting the tape off his hands and thought defendant saw him in the rearview mirror. Defendant pulled over and stopped, as did Navarro. Defendant told Navarro the victim was trying to take off the tape, but Navarro said it was fine. They both drove back onto the freeway. The victim continued unraveling his tape, and defendant pulled over again. While the car was still moving, the victim jumped out of the vehicle and was rescued by a couple driving by. Defendant left the Prius and got into the 4Runner with Navarro, who drove them away.

This evidence reveals that defendant took numerous intentional and calculated steps over a substantial period of time to kidnap and rob the victim with Navarro. She rented a motel room with Navarro, initiated contact with and lured the victim to the motel room, stood by while Navarro violently attacked the victim, helped Navarro steal the

14

victim's money, independently returned to the motel room, suggested taking the victim to the woods, drove away in the victim's car, transferred the victim to the Prius, drove off in tandem with Navarro, and stopped twice to ensure the victim remained bound. This evidence also reveals that defendant had numerous opportunities to abandon Navarro and their scheme but did not do so. Specifically, she initiated the encounter by entering the victim's car at the gas station and luring him into the motel room, and she left while Navarro held the victim to the bed with a box cutter but returned to the motel room shortly thereafter. She also initially drove off in the victim's car by herself, and later, with the victim, yet continued to drive in tandem with Navarro and execute their crimes. It was reasonable for the trial court to infer from these facts that, because defendant was recently capable of engaging in such violent, calculated criminal behavior, she posed a risk of doing so again.

Additional evidence in the record supports the trial court's determination that defendant was likely to commit a super strike if treated in the community. Indeed, defendant's history reflects a lack of compliance with court-ordered treatment, which culminated in her super strike charges. The charged crimes in this case occurred on August 28, 2016. (*Graham I*, *supra*, C087027.) Several months prior, on March 30, 2016, defendant received three years of probation and a one-year jail term for unlawfully taking another's vehicle. (Veh. Code, § 10851, subd. (a).) According to defendant's probation officer, her most recent report to probation was that she was homeless and participating in a drug treatment program. However, she last attended the treatment program on August 10, 2016, and failed to complete it. She also failed to report to probation on August 31, 2016, and September 9, 2016, as directed, and last contacted her probation officer by phone in late September 2016. She was informed at that time that a violation of probation petition had been filed and a hearing set, but she failed to appear in court for the hearing, resulting in a warrant for her arrest.

15

Further, shortly before the charged crimes, defendant was asked to leave a shelter for battered women after she twice failed to obey its curfew. She also previously failed to comply with court-ordered treatment by refusing to participate in drug testing, counseling, appointments, and meetings, and failed to benefit from or complete prior court-ordered mental health treatment. These facts indicate that, when offered treatment in the community, defendant was noncompliant and, in fact, engaged in behavior resulting in two super strikes. Additionally, if released into the community, defendant again would have access to illicit substances and alcohol, which would increase her likelihood of committing a violent felony. Relatedly, the treatment program that defendant sought to use if diverted would be unsecured and create the risk and opportunity for relapse. Based on the foregoing, substantial evidence supports the trial court's finding that defendant was not suitable for diversion.

In reaching this conclusion, we acknowledge that one could read the trial court's dangerousness analysis to indicate it found defendant's super strike convictions themselves dispositive as a matter of law, categorically barring her from being found suitable. However, we do not read the analysis so narrowly. Rather, we interpret the trial court's inquiry to acknowledge that this case presented a unique posture, as the jury had already reached a verdict before the diversion hearing. And viewing the comments as a whole, they suggest that the evidence at trial of defendant's charged crimes, and not simply the fact that she was convicted, guided the court's finding of dangerousness. Before rendering its decision, the court questioned the attorneys extensively regarding defendant's behavior in prison and other factors, clearly considering them and finding them to be relevant. It also asked the prosecutor whether she viewed defendant's convictions as sufficient to meet the dangerousness requirement alone, to which the prosecutor responded, "I don't think that by itself. That's why I've mentioned all the other things that I've mentioned." When making its findings, the court remarked that defendant's "participation in this case" and "what the two crimes were" were relevant to

16

its analysis, and not simply the fact she was convicted. In any event, as discussed *ante*, substantial evidence supports the trial court's finding that she posed an unreasonable risk of committing a new violent super strike.

Because we conclude that the trial court did not abuse its discretion in finding defendant was not suitable for diversion, we affirm its denial on this ground alone, and we need not address defendant's alternative contention that she was eligible for diversion.

DISPOSITION

The judgment is affirmed.

\s\
—————————————————————,
Krause, Acting P. J.

We concur:

\s\
—————————————————————,
Boulware Eurie, J.

\s\
—————————————————————,
Ashworth, J.*

---

*     Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.